1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| 10 MELCHIOR INCIONG, | Case No:  C 10-03384 SBA |
| 11     Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| 12     vs. | **UNDER SEAL** |
| 13 FORT DEARBORN LIFE INSURANCE COMPANY, and REDKEN LABORATORIES, INC. LONG TERM DISABILITY PLAN, | Docket 34, 38 |
| 15 | |
| 16     Defendants. | |

17

18          Plaintiff Melchior Inciong ("Plaintiff") brings this action under the Employee

19 Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., to

20 challenge the termination of his long-term disability insurance benefits by Fort Dearborn

21 Life Insurance Company ("Fort Dearborn").  The parties are presently before the Court on

22 the parties' cross-motions for judgment under Federal Rule of Civil Procedure 52.  Dkts.

23 29, 66.  After consideration of the parties' briefs and the record presented, the Court makes

24 the following Findings of Fact and Conclusions of Law.  The Court, in its discretion, finds

25 this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D.

26 Cal. Civ. L.R. 7-1(b).

27

28

# FINDINGS OF FACT

## EDUCATIONAL AND EMPLOYMENT HISTORY

1.      Plaintiff is an adult male born on July 5, 1959.  AR 179.  In 1981, Plaintiff earned a Bachelor of Science in Chemistry from the University of California, Los Angeles ("UCLA").  AR 117, 657.  He later earned a Masters degree in Business Administration ("MBA") from Pepperdine University in 1986.  AR 117-118, 657.

2.      From 1981 to 1994, Plaintiff worked for Redken Laboratories, Inc. ("Redken").  His final position, which he held from September 1992 to June 1994, was Director of Industrial Chemistry and Quality Assurance, a position that required him, inter alia, to ensure compliance with Good Manufacturing Practices ("GMPs") for the plant.  AR 118, 657.

3.      Prior to the Director position, Plaintiff held the following positions at Redken:  Manager of Process Engineering/R&D International (May 1989-September 1992); Group Leader (1987-1989); Senior Product/Process Engineer (August 1982-August 1987); and Quality Control Chemist (August 1981-August 1982).  AR 118, 657.

## REDKEN'S LONG-TERM DISABILITY BENEFITS PLAN

4.      During the course of his employment at Redken, Plaintiff became a participant in the Redken Laboratories, Inc. Long Term Disability Plan ("the Plan").  Compl. ¶ 6.

5.      Disability benefits under the Plan were provided to Plan participants through a group insurance policy issued by Fort Dearborn.  Compl. ¶ 8.

6.      To obtain disability benefits, a Plan participant must be "totally disabled" as defined therein.  The Definitions section of the Plan states:

> TOTAL DISABILITY or TOTALLY DISABLED means . . . .

> [A]fter 24 months of benefits have been paid, the insured is unable to perform with reasonable continuity all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.

AR 25.

7.   The Plan requires an insured to provide the Company proof of continued disability and regular attendance of a physician to be eligible for continued benefits. AR 30.

8.   Proof of continued disability and regular attendance of a physician must be given to the Company within thirty days of the request for the proof.  AR 44.

9.   The monthly benefit ceases on the earliest of:  (a) the date the insured is no longer disabled; (b) the date the insured dies; (c) the end of the maximum benefit period; or (d) the date the insured's current earnings exceed 85% of his indexed pre-disability earnings.  AR 33.

**PLAINTIFF'S DIAGNOSIS OF DISABILITY**

10.   In or about June 1994, Plaintiff contracted pneumocystis pneumonia and was diagnosed as being HIV-positive.  AR 999-1000.

11.   On or about October 7, 1994, Plaintiff completed an application for long term disability benefits from Fort Dearborn.  AR 223.

12.   On December 20, 1994, Dr. Michael Gottlieb, Plaintiff's treating physician, sent Fort Dearborn a letter stating that:  "Due to his illness he is permanently disabled." AR 916.

13.   In early February 1995, Dr. Gottlieb completed a Fort Dearborn form entitled, Attending Physician's Statement of Disability, which specified a diagnosis of "AIDS."  AR 955.

14.   On February 17, 1995, Fort Dearborn approved Plaintiff's claim for long term disability benefits, retroactive to September 21, 1994.  AR 878.

15.   Around the same time period, the Social Security Administration found that Plaintiff was "disabled" and approved payment of disability benefits as of December 1994. AR 219.

**TERMINATION OF PLAINTIFF'S LONG-TERM DISABILITY BENEFITS**

16.     In or about 2008, as part of its periodic review of the Plaintiff's disability status, Fort Dearborn retained the services of Claims Bureau USA, Inc. ("Claim Bureau"), which was assigned to conduct an activities check and surveillance on the Plaintiff.  AR 483.

17.     Claims Bureau engaged two agents to conduct video surveillance on the Plaintiff on July 21, 2008, August 4, 2008 and August 5, 2008, outside his home in West Hollywood, California.  AR 511-517.  The results of the surveillance are set forth in a report, dated August 11, 2008.  Id.

18.     The July 21 surveillance yielded no notable observations.  AR 517.  Although the agents observed Plaintiff leave the residence at 9:15 a.m. in a vehicle, they lost track of him.  Id.

19.     On August 4 at around 9:11 a.m., two agents observed Plaintiff leaving his residence and driving to Crunch Gym located at 8000 Sunset Blvd., Los Angeles, California, where he arrived at 9:14 a.m.  AR 513.  Plaintiff exited his vehicle wearing a tank top and shorts, and carrying a gym bag.  Id.  He left the gym at 10:56 a.m. and returned home.  Id.  Later in the day, Plaintiff drove to a bank and then to Farmers Market, an upscale shopping plaza where he remained for a couple of hours.  Id.  Plaintiff then travelled to a bookstore and then returned to his home.  Id.

20.     On August 5, Claim Bureau agents observed the Plaintiff leaving his residence at 8:27 a.m. and drive to a book store located a short distance away.  AR 514. After leaving the bookstore, he arrived at Crunch Gym at 8:57 a.m.  Id.  At 10:21 a.m., Plaintiff left the gym and returned to his residence at 10:30 a.m.  Id.  At 12:22 p.m., Plaintiff and a female (who Plaintiff claims is his partner's mother) left his residence and again travelled to the Farmers Market shopping center.  Id.  At the Farmers Market, Plaintiff and his female companion went to a book store, and later to a movie theatre.  Id. Approximately two and one-half hours later, they left the movie theatre and returned to the Plaintiff's residence at 3:37 p.m.  Id.

21.     Subsequent to conducting surveillance on the Plaintiff, Claims Bureau conducted an activities check.  AR 483.  In its report, dated August 21, 2008, Claims Bureau indicates that it determined that Plaintiff is a member of a viovio.com.  AR 485. Plaintiff's profile on that site contains three picture galleries which purportedly showed Plaintiff and his partner, Anthony Santoni ("Santoni") in Brazil in 2007 and Uruguay in 2008.  AR 487.  In addition, the report stated that Plaintiff was associated with Anthony's Miniature Schnauzers, a dog breeding business registered to Santoni that generates annual sales of $41,000.  Id.  According to "a reference supplied by Santoni," Plaintiff and Santoni are equal partners in the business.  Id.

22.     In February 2009, Fort Dearborn submitted Plaintiff's file to The Physician Network for an independent medical review.  See Defs.' Mot. at 3.  The Physician Network, in turn, retained Dr. Henry Feder, a physician board-certified in infectious diseases, to review Plaintiff's medical records.  Id.

23.     On February 11, 2009, Dr. Feder issued a report based on his review of Plaintiff's medical records from 1994 through February 2008.  AR 461.  He noted that, although the Plaintiff was seen by his physician Dr. Gottlieb on several occasions over the prior six months, not once was he treated for an illness that Dr. Gottlieb related to HIV.  Dr. Feder noted that while it was clear that Plaintiff was very sick in 1994, his condition has improved to the point where his viral load had become undetectable and his CD4/T Cell count showed that he had no immune suppression and his weight appeared normal.  He also reported seeing "nothing in the medical record that gives him physical or mental impairment" and "no severe problems over the last 10 years except for perhaps bowel obstruction [in February 2008] . . . ."  Id.

24.     Dr. Feder emphasized that although Dr. Gottlieb had concluded that Plaintiff had a Class V physical and a Class IV mental disability, Dr. Feder could see nothing in the medical records which supported such a conclusion.  Id.  Dr. Feder invited Dr. Gottlieb to respond by describing specific restrictions and limitations and test results which would support Dr. Gottlieb's assessment.  AR 463.  However, Dr. Gottlieb never returned his call.

Id.  Thus, based on the "very incomplete records" available, Dr. Feder completed his review and opined that there was an insufficient basis upon which to find the Plaintiff was totally disabled.  AR 463-464.

25.     On February 19, 2009, Dr. Feder faxed a letter to Dr. Gottlieb which summarized his findings.  AR 458-59.  In the conclusion of the letter, Dr. Feder states: "If you feel this summary is inaccurate, please offer specific restrictions and limitations and provide any testing that would support your assessment."  AR 459.

26.     On February 23, 2009, Dr. Gottlieb responded to Dr. Feder in a one paragraph-long letter, which states as follows:

> I received your fax re the above patient.  I disagree with your determination.  *Mr. Inciong continues to be highly symptomatic with fatigue, gastrointestinal side effects of medication, and disfiguring lipodystrophy.*  These finding (sic) are listed in periodic updates to his disability carrier.  They may not be reflected in my chart notes because I do not consider these symptoms to be remediable.  They have been chronic and consistently reported by him in all his interval histories.  My chart notes focus on the adequacy of the antiviral management of his immune deficiency syndrome and omit his consistent report of these symptoms.

AR 383.  There is no mention of any specific restrictions or limitations, or reference to any related testing to support Dr. Gottlieb's assessment.

27.     In an effort to obtain more information regarding the current extent and severity of the Plaintiff's level of impairment, Fort Dearborn sent a letter, dated February 25, 2009, to Dr. Gottlieb requesting:  (1) copies of office notes, basic laboratory data and other pertinent tests or consultations from 2005 to the current date; (2) office records of primary care physicians and consultants, hospital history, physical and discharge summaries; (3) laboratory tests, including blood counts, chemistries, cultures, CD4 counts, and HIV viral loads; (4) imaging reports such as x-rays, CTs or MRIs; and (5) information regarding medications and doses.  AR 432-33.

28.     Dr. Gottlieb failed to respond to Fort Dearborn's request.  AR 1093.  Thus, on April 1, 2009, Fort Dearborn contacted Plaintiff regarding Dr. Gottlieb's lack of response to its February 25 letter.  AR 1093.  Fort Dearborn enclosed a copy of that letter and requested that Plaintiff contact Dr. Gottlieb to have him send the requested information.  Id.

29.     Dr. Gottlieb's office subsequently responded that it would provide the requested information upon receipt of a $100 payment.  AR 395.  Fort Dearborn made several requests for an invoice from Dr. Gottlieb's office, to which it received no response.  Id.  Eventually, however, Dr. Gottlieb's office responded to Fort Dearborn's document request, but only provided records covering the time period from December 4, 2008 to May 4, 2009, without any test results.  Id.

30.     Fort Dearborn forwarded the records produced by Dr. Gottlieb to Dr. Feder for his review.  AR 400.  Following his review of those records, Dr. Feder reached the following conclusion:

> The available data from December 2008 to May 2009 notes that there were multiple visits with nothing specific except for a URI [urinary tract infection].  He is described as having some lipoatrophy [i.e., loss of fat] but being in good shape and well developed.  There is no mention of laboratory tests done for HIV, and there are no reasons given that explain why because of his HIV infection that he would be disabled.  In fact, the patient seems stable and doing well, and from these new records, there is nothing mentioned that would explain him being disabled and unable to work.

AR 401.

31.     On June 24, 2009, Fort Dearborn sent Plaintiff a letter notifying him that it was terminating his long-term disability benefits.  AR 394.  In the termination notice, Fort Dearborn recounts a conversation with the Plaintiff on December 1, 2008 during which he stated that he engaged in little activity due to fatigue, neuropathy in the lower extremities, and diarrhea, that he left the house infrequently and only to drive short distances on "good days," could not use a treadmill, and was unable to travel and had not done so in the last two years.  Id.  In apparent contradiction to Plaintiff's statements, Fort Dearborn noted:

> Mr. Inciong, It (sic) is known that you traveled to Brazil in July 2007 and to Argentina and Uruguay in April of 2008.  You also have been observed periodically during the months of July and August 2008 going to a gym on a regular basis, shopping, attending a theatre, luncheons and driving daily.  In addition, we have determined that you play an active role in the business of 'Anthony's Miniature Schnauzers.'  Therefore, we feel that you have demonstrated a level of activity above that which you have reported.

AR 394-395.

32.     In addition to its concerns regarding the veracity of Plaintiff's claims of disability, Fort Dearborn noted that Dr. Gottlieb failed to respond on two separate occasions to Fort Dearborn's requests for Plaintiff's medical records for the time period from January 1, 2007 to the then current date of July 1, 2008.  AR 395.  Fort Dearborn also disclosed that it had submitted Plaintiff's file to Dr. Feder for an independent medical review and that he had opined that Plaintiff's medical records did not support the conclusion that he was disabled and unable to work.  Id.  The termination letter concludes: "[B]ased on the level of activities observed and the lack of objective medical information to support total disability as defined by the LTD [long term disability] contract, we must deny further LTD benefits based on the fact that you are not totally disabled from your own or any occupation.  Benefits are paid to July 22, 2009 and your LTD claim is now closed." Id.

33.     Shortly after the termination of Plaintiff's long term disability benefits, Dr. Gottlieb forwarded to Fort Dearborn an Attending Physician's Statement ("APS") in support of Plaintiff's request for a continued waiver of the premium for his group life insurance coverage.  AR 1135-36.  In the APS, Dr. Gottlieb stated that Plaintiff was "ambulatory" and was not "house confined."  AR 1135.  In the Limitations section of the APS, Dr. Gottlieb did not note any limitation with respect to sitting, but indicated the Plaintiff's fatigue prevented him from standing or walking for more than an hour at a time and that he has "poor coordination" due to neuropathy.  AR 1136.  In the Physical Impairment section of the APS, Dr. Gottlieb noted that Plaintiff had a "[m]oderate limitation of functional capacity, capable of clerical/administrative (sedentary*) activity[.]" Id.

**APPEAL OF DECISION TO TERMINATE BENEFITS**

34.     Plaintiff retained Chambers Benefits Consulting ("Chambers") to appeal Fort Dearborn's decision to terminate his benefits.  Chambers sent an appeal letter to Fort Dearborn, dated December 19, 2009, and subsequently forwarded updated medical records on February 10, 2010.  AR 358-362.[1]

35.     The updated records included a June 15, 2009 office note from Dr. Gottlieb that listed Plaintiff's complaints of fatigue and diarrhea, but did not quantify them in terms of severity or duration.  AR 175.  The rest of the physical exam was the same as the office notes from the most recent months.  Id.  Again, while Dr. Gottlieb listed "unintentional weight loss and loss of appetite" as subjective symptoms, Plaintiff's weight actually increased four pounds over the prior thirty-day period.  Again, no physical limitations were noted.  AR 175, 177.

36.     The next office visit record submitted in support of Plaintiff's appeal was for an August 10, 2009 visit.  AR 171-72.  Dr. Gottlieb listed painful neuropathy, diarrhea and fatigue as complaints.  AR 171.  As before, there was no quantification of the severity or duration of any of the symptoms, no detail regarding any physical limitations, and the rest of the physical exam, like the prior exams, stated that Plaintiff was not in any acute distress, responded appropriately to questions, had normal gait, had no movement abnormalities and had no problems in the extremities.  AR 171-72.

37.     The final record from September 8, 2009 was similar to prior records except that Plaintiff suffered a minor laceration and swelling after bumping his head while walking his dog in the middle of the night.  Like the other reports, there were no physical limitations

---

[1] In its appeal letter, Chambers noted that Plaintiff did not travel to Uruguay, but did fly to Brazil for plastic surgery to address a disfiguring side effect of his HIV medication, and to Venezuela to visit family and friends and to investigate the possibility of relocating there.  AR 361.  Chambers also denied that Plaintiff was involved in his partner's dog business.  AR 362.  The discrepancy between this information provided by Chambers and that contained in Claims Bureau activities report, however, are not material to the outcome of this action.

1    listed, no test results and no information regarding the severity or duration of any of

2    Plaintiff's symptoms.  AR 168-69.

3         38.    Plaintiff's file, including all medical records dating back to the onset of his

4    disability in 1994, were forwarded by Fort Dearborn to Dr. Daniel P. McQuillen, a board

5    certified physician in internal medicine and infectious diseases.  AR 140-49.  On March 25,

6    2010, Dr. McQuillen submitted a ten-page report which reflected a detailed review of

7    Plaintiff's fifteen-year medical history.  AR 141-145.   Dr. McMillen noted that since

8    Plaintiff's diagnosis in 1994, his CD4/T Cell count has increased from 150 and is now

9    stabilized in the "450-600+ range" and that his viral load is undetectable on his

10   medications.  AR 146.

11        39.    Dr. McMillen found that Plaintiff's medical records support Dr. Gottlieb's

12   diagnosis of lipodystrophy/lipoatrophy which would "potentially impair the ability for

13   prolonged sitting on hard surfaces if indeed there has been extensive loss of buttock fat."

14   AR 147.  However, Dr. McMillen noted that such condition could be mitigated through the

15   use of "appropriate padding in chairs."  Id.  As for Plaintiff's neuropathy and fatigue, which

16   are claimed to impair his ability to walk, sit and stand, Dr. McMillen opined that the

17   surveillance of Plaintiff shows him engaging in activities that contradict these alleged

18   limitations.  Id.  Finally, Dr. McMillen noted that Plaintiff's medications are known to

19   cause diarrhea, but that was no indication that he had taken any anti-diarrheal medications,

20   such as Immodium or Lomitil.  AR 147.  He also believed that Plaintiff's stable weight

21   suggested that diarrhea was not a significant problem, and that, in any event, the records

22   failed to quantify his diarrhea with any actual functional impairment.  Id.  Although Dr.

23   McMillen called Dr. Gottlieb's office on three occasions to discuss Plaintiff's case, Mr.

24   Gottlieb never returned his call.  AR 149.   Dr. McQuillen concluded that none of the

25   diagnoses cited would prevent Plaintiff from performing full-time sedentary work.  AR

26   148.

27        40.    On or about March 25, 2010, Fort Dearborn retained R.E.M. Vocational

28   Services ("REM") to conduct an Appeals Vocational Review.  AR 116.  Vocational

- 10 -

Consultant Ruby MacDonald concluded that although Plaintiff is highly-educated, skilled and has significant work experience, she was unsure to what extent Plaintiff's sixteen-year absence from the job market would have on his employment options.  AR 120-21. Accordingly, she suggested that a Labor Market Survey ("LMS") be conducted.  AR 121.

41.     After receiving the Appeals Vocational Review, Fort Dearborn directed REM to conduct a LMS.  AR 124.  Specifically, Fort Dearborn wanted to know "whether or not there are viable occupations that exist for [Plaintiff] in his local labor market and whether he would be 'hirable' with prior experience, education, training and also taking into consideration that he has not worked for numerous years." AR 124-25.

42.     Ability Services Network ("ASN") was retained to conduct the LMS. AR 97. The survey was conducted utilizing various job search modalities which resulted in eleven potential employers located within fifty miles of Plaintiff's residence.  AR 98.  Of the eleven employers eventually contacted, six employers responded that Plaintiff was qualified and would possibly be considered for a position if it were available, notwithstanding his extended absence from the workplace.  AR 97-110.  Five of those employers stated that Plaintiff's physical limitation, specifically his need to change position and avoid sitting or standing for long durations, would be accommodated, and the sixth, United Healthcare, stated that Plaintiff would be able to work from home.  Id.  Of those six employers, five actually had current openings as of the dates they were contacted.  Id.

43.     On May 31, 2010, Fort Dearborn sent a letter to Chambers informing it that an additional review of Plaintiff's claim for long term disability benefits had been concluded, and that the claim denial would be upheld.  AR 69-73.  The letter detailed the relevant Plan language, the history of the claims review, and the specific bases for upholding the claim denial, and informed Plaintiff that he had the right to file suit or to request a second review of the claim.  Id.

**PROCEDURAL HISTORY**

44.     On August 2, 2010, Plaintiff filed the instant action in this Court against Fort Dearbon and the Plan seeking to challenge the termination of his long term disability

1  benefits.  Dkt. 1.  The parties stipulated to the dismissal of the Plan from this action on July

2  22, 2011.  Dkt. 29.

3       45.     On August 2, 2011, Plaintiff and Fort Dearborn filed cross-motions for

4  judgment.  Dkt. 34. 36, 38.  On September 23, 2011, Fort Dearborn filed the administrative

5  record, under seal.  Dkt. 50, 51. The motions are fully briefed and are ripe for adjudication.

6                               **CONCLUSIONS OF LAW**

7                               **LEGAL STANDARD**

8       46.     Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on

9  the facts without a jury . . . , the court must find the facts specially and state its conclusions

10 of law separately."  In a Rule 52 motion, as opposed to a Rule 56 motion for summary

11 judgment, the Court does not determine whether there is an issue of material fact, but

12 actually decides whether the plaintiff is disabled under the policy.  See Kearney v. Standard

13 Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999).  The Court is to "evaluate the persuasiveness

14 of conflicting testimony," and make findings of fact.  Id.  This is considered a "bench trial

15 on the record," which may "consist[] of no more than the trial judge rereading [the

16 administrative record]."  Id.

17      47.     The parties agree that the denial of Plaintiff's long-term disability benefits is

18 subject to de novo review.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115

19 (1989) ("a denial of benefits challenged under [ERISA] is to be reviewed under a de novo

20 standard unless the benefit plan gives the administrator or fiduciary discretionary authority

21 to determine eligibility for benefits or to construe the terms of the plan.").  Under this

22 standard, the court "does not give deference to the claim administrator's decision, but rather

23 determines in the first instance if the claimant has adequately established that he or she is

24 disabled under the terms of the plan."  Muniz v. Amec Constr. Mgmt., Inc., 623 F.3d 1290,

25 1295-96 (9th Cir. 2010).  In doing so, the district court is to determine whether the plaintiff

26 is "entitled to benefits based on the evidence in the administrative record and other

27 evidence as might be admissible . . . ."  Opeta v. Nw. Airlines Pension Plan for Contract

28 Employees, 484 F.3d 1211, 1217 (9th Cir. 2007) (internal quotation omitted).

48.     "[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant." Muniz, 623 F.3d at 1294.  More specifically, the "plaintiff carries the burden of showing, by a preponderance of the evidence, that he was disabled under the terms of the Plan during the claim period." Oster v. Standard Ins. Co., 759 F. Supp. 2d 1172, 1185 (N.D. Cal. 2011) (Armstrong, J.). The fact that a plaintiff was originally initially awarded disability benefits does not alter that burden.  Muniz, 623 F.3d at 1296.  "[T]he burden of proof continues to lie with the plaintiff when disability benefits are terminated after an initial grant."  Id.  In addition, a defendant has no obligation to show that the plaintiff's condition has improved.  Id. at 1296-97.

49.     As noted, the question of whether Plaintiff is disabled for purposes of eligibility for long term disability benefits governed by the express language of the Plan, which provides:

> "[A]fter 24 months of benefits have been paid, the insured is unable to perform with reasonable continuity all of the material and substantial duties of his own or *any other occupation* for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity."

AR 25 (emphasis added).  In other words, Plaintiff must, by a preponderance of evidence, show that, as of the date his benefits were terminated, he was physically incapable of performing duties of any occupation for which he is qualified by way of training, education, experience, age and physical and mental capacity.  See Oster, 759 F. Supp. 2d at 1185.

50.     The "any occupation" standard is "not demanding." Pannebecker v. Liberty Life Assur. Co. of Boston, 542 F.3d 1213, 1219 (9th Cir. 2008).  The claimant need only be able "to perform a job for which he is qualified or for which he can reasonably become qualified by training, education or experience." McKenzie v. Gen. Tel. Co. of Cal., 41 F.3d 1310, 1317 (9th Cir. 1994), overruled on other grounds by Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 872 n.2 (9th Cir. 2008).  Whether the "any occupation" requirement is satisfied generally requires consideration of (1) evidence "as to the medical condition or degree of impairment of the claimant" and (2) "evidence as to the

existence of jobs for those of the claimant's qualifications, or potential qualifications, in light of his or her impairment."  Id. at 1316-17.  However, "consideration of vocational evidence is unnecessary where the evidence in the administrative record supports the conclusion that the claimant does not have an impairment which would prevent him from performing some identifiable job."  Id. at 1317.

**MEDICAL EVIDENCE**

51.     The medical evidence in the administrative record supports Fort Dearborn's conclusion that Plaintiff was able to perform the duties of "any occupation" for which he was reasonably fitted.  Dr. McQuillen, a board-certified physician in internal medicine and infectious diseases, reviewed Plaintiff's medical records from Dr. Gottlieb, the video surveillance recordings of Plaintiff, lab reports and other materials in the claims file.  AR 141.  Based on that review, Dr. McQuillen opined that since Plaintiff's initial HIV diagnosis in 1994, his disease "has been well controlled" with a "stable" T cell count and undetectable viral loads.  AR 146.  Although the medical records documented Plaintiff's lipoatrophy in the buttocks, which could impair Plaintiff's ability to sit on a hard surface for an extended period of time, Dr. McQuillen stated that this issue could be accommodated through the use of padded chairs.  AR 147.  As for Plaintiff's complaints of intermittent diarrhea, he noted that such complaint was not quantified and that his stable weight counseled against a determination that his diarrhea was "significant."  Id.  He also found that Plaintiff's purported limitations with respect to standing and walking were contravened based on his review of the video surveillance footage.  Id.  Ultimately, Dr. McMillen concluded that Plaintiff's medical issues did not his preclude his ability to "conduct full time sedentary work."  AR 148.

52.     Plaintiff contends that the medical reviews conducted Dr. McQuillen, as well as the pre-termination review by Dr. Feder, should be rejected on the ground that they failed to take into account Dr. Gottlieb's allegedly consistent opinion that Plaintiff is permanently disabled.  See Pl.'s Mot. at 5-9; Pl.'s Resp. at 2-10.  Plaintiff argues that Dr. Gottlieb's evaluation of Plaintiff's functional limitations between 1994 and 2009 had not

1   changed, and that during that time period, Fort Dearborn found Plaintiff eligible for long

2   term disability benefits.  However, while such evidence may be relevant to whether

3   Plaintiff is disabled, it does not relieve him of his burden of demonstrating that he is

4   disabled at the time benefits are sought.  <u>Muniz</u>, 623 F.3d at 1296.  Moreover, the fact that

5   an insurer previously paid benefits does not mean that an insurer "can never change its

6   mind" regarding the claimant's eligibility.  <u>Id.</u>

7          Although Dr. Gottlieb has repeatedly insisted that Plaintiff is disabled, he has

8   provided little in the way of actual evidence to support this conclusion.  For example, Dr.

9   Gottlieb told Dr. Feder that Plaintiff "continues to be highly symptomatic with fatigue,

10  gastrointestinal side effects of medication, and disfiguring lipodystrophy."  AR 383.  Yet,

11  Dr. Gottlieb did not quantify these generalized assertions or otherwise explain how they

12  necessarily supported the conclusion that Plaintiff was unable to perform the duties of any

13  occupation.  <u>Id.</u>  Nor did Dr. Gottlieb support his conclusory assertions with any test results

14  or lab data, notwithstanding Dr. Feder's specific request for such documentation.  AR 459.

15         53.    Plaintiff's reliance on Dr. Gottlieb's July 2009 APS, which was submitted to

16  Fort Dearborn, fares no better.  <u>See</u> Pl.'s Resp. at 3-4; AR 1135.  Dr. Gottlieb noted

17  subjective symptoms as "fatigue, body fat redistribution, diarrhea and neuropathy," but he

18  did not cite any related objective findings.  AR 1135.  In terms of limitations, Dr. Gottlieb

19  noted that Plaintiff "fatigues easily, cannot stand or walk > 1 hr., poor coordination due to

20  neuropathy."  AR 1136.  He classified Plaintiff as having a physical impairment (as defined

21  in the Federal Dictionary of Occupational Titles), a class 4 impairment, meaning that

22  Plaintiff was "capable of clerical/administrative (sedentary) activity" in non-stressful

23  environments.  <u>Id.</u>

24         54.    While Dr. Gottlieb's reports and records may support the general proposition

25  that Plaintiff continues to suffer some limitations resulting from HIV and/or the side effects

26  of HIV medications, they are largely unsupported by objective test results or by any

27  specific delineation of those limitations in terms of Plaintiff's ability to work in any

28  capacity.  In fact, the lab results showed the opposite; namely, that Plaintiff's course of

treatment was effective at increasing his T-cell count and reducing his viral load to an undetectable level.   AR 146.  Plaintiff counters that "[t]here are no medical studies which correlate the link between an individual's viral load to the presence, absence, or severity of any disabling functions."  Pl.'s Mot. at 11.  The only support offered for this assertion is a citation to the report prepared by Chambers, the company hired by Plaintiff in connection with his administrative appeal following the termination of benefits.  AR 359.  However, the report provides no evidentiary support or citation to any authority to support this assertion.

55.     Plaintiff's lack of objective and quantifiable information to support his claim of total disability is further underscored by Claims Bureau's report of Plaintiff's activities. Plaintiff attempts to minimize the significance of these observations, claiming that none of them "were inconsistent with what [he] had reported he was capable of doing."  Pl.'s Mot. at 24.  In particular, Plaintiff points to a disability report in 1996 wherein he reported that in the morning "[he] plays with the dog, watches television, [and performs] personal grooming."  AR 788.  He indicated "[going] to the store just to get out of the house for an hour or so," and that four to five times per week he drives a distance of five to six miles. Id.  He also reported being unable to sit for too long due to leg cramps and back pain or stand for extended periods of time due to neuropathy.  AR 265.

56.     Despite Plaintiff's claims to the contrary, the record shows that his level of activity has actually improved over time.  The surveillance from 2008 revealed that Plaintiff began his day around 9:00 a.m. by going to the gym, which was followed by several subsequent excursions from his home for various errands to the bookstore, shopping

mall and movie theatre. AR 512-516.[2] Instead of being limited to an hour-long trip to "get out of the house," AR 788, Plaintiff was observed making several trips from his residence spanning the early morning through the early afternoon. And whereas Plaintiff previously reported limitations on sitting, Plaintiff was seen going to the movie theatre where he stayed for over two hours. AR 516. In addition, in 2008, Plaintiff travelled from the United States to Brazil and Venezuela, AR 487, which undoubtedly required him to remain seated for an extended period of time. While the information obtained by Claims Bureau on behalf of Fort Dearborn may not, standing alone, establish that Plaintiff is capable of performing the duties of any occupation, it is not Fort Dearborn's burden to establish that Plaintiff's condition improved since the time his disability were previously approved. Muniz, 623 F.3d at 1296. Nonetheless, the Court finds that such information undercuts Plaintiff's claim of disability, which is otherwise not sufficiently substantiated by Dr. Gottlieb's records and opinions.

### VOCATIONAL EVIDENCE

57.     As noted, the Court need not consider vocational evidence where, as here, the record supports the conclusion that "the claimant does not have an impairment which would prevent him from performing some identifiable job." McKenzie, 41 F.3d at 1317. Nonetheless, to the extent that such evidence is considered, the Court finds that it weighs in favor of Fort Dearborn.

58.     In connection with Plaintiff's administrative appeal, Fort Dearborn directed ASN to conduct a labor survey (i.e., the LMS) to determine whether Plaintiff was then

---

[2] Plaintiff asserts that there is no evidence concerning his activities within the gym. See Pl.'s Mot. at 9. Perhaps so, but given that Plaintiff, who is described as having an "athletic build," and was observed wearing a tank top and shorts and carrying a gym back with him as he entered the gym, it is reasonable to infer that he intended to, and did, engage in some form of exercise. AR 513. Plaintiff also attempts to downplay the significance of his gym visits by claiming that many physicians encourage their HIV patients to go to gyms for light exercise and social interaction. See Pl.'s Mot. at 10 n.4. This contention misses the point. The fact that Plaintiff was observed going to the gym does not ipso facto mean that he is not disabled. However, the fact that Plaintiff is able to go the gym, shop at bookstores, walk around at the shopping mall and sit in a movie theatre certainly undermines his claim that he is unable to work.

employable.  AR 116.  Of the eleven employers contacted, six of them (Germstar, Watson

Pharmaceuticals, Neutrogena Corporation, Stivers, United Healthcare and UCLA)

responded that a person with Plaintiff's background, experience and specific limitations

would possibly be considered for a position if it were available, notwithstanding his sixteen

year gap in employment.  Five of those employers stated that Plaintiff's physical

limitations, specifically his need to change position and avoid sitting or standing for long

durations, would be accommodated, and the sixth, United Healthcare, stated that Plaintiff

would be able to work from home.  Of those six employers, five actually had current

openings as of the dates they were contacted.  AR 97-110.

59.     Plaintiff challenges the significance of the LMS, claiming that "none of the

potential 'employers' . . . would actually consider hiring [him]."  Pl.'s Responsive Brief on

Mot. for Judgment ("Pl.'s Resp.") at 16, Dkt. 41.  This contention lacks merit.  As an initial

matter, the Plan's definition of disability does not require a showing that Plaintiff, in fact,

would be hired for a specific job.  AR 25.  Rather, it merely requires Plaintiff to show that

he is incapable of performing the duties of any job for which he is qualified.  See

McKenzie, 41 F.3d at 1317 (noting that the salient question under the "any occupation"

standard is whether the claimant "could perform other occupations").  Here, the employers'

responses to the LMS show that, even with his particular physical limitations and sixteen

year absence from the workforce, Plaintiff would be qualified for various positions with

certain of the companies which participated in the survey.

**Germstar**

60.     Nor does the Court find compelling Plaintiff's arguments pertaining to the

responses of these potential employers.  For instance, Plaintiff seizes upon Germstar's

statement that it "would prefer" that a candidate for the Quality Assurance Manager

("QAM") position have "at least one year experience with the processes associated with

GMP and FDA compliance," and "knowledge of the regulatory rules or [the ability] . . . to

learn them quickly."  AR 85-86.  Plaintiff surmises that given Germstar's responses, "[he]

was unqualified for this occupation because he lacked the required current knowledge

1   regarding the regulatory rules and that there was no evidence that he would be able to learn

2   these rules quickly." Pl.'s Resp. at 16. But under <u>Muniz</u>, it is Plaintiff's—not Fort

3   Dearborn's—burden to show that he would be unable to learn the necessary regulatory

4   requirements. 623 F.3d at 1296. Not only has Plaintiff failed to make such a showing, the

5   record supports the opposite conclusion; namely, that he would have little difficulty in

6   quickly learning the regulations germane to QAM position at Germstar. The record shows

7   that Plaintiff is well-educated with extensive field-related professional experience, and

8   would more than likely have been able to learn the necessary regulations. Given Plaintiff's

9   academic and professional experience, it strains credulity for him to suggest that he would

10  be unable to learn the relevant regulations applicable to a QAM at Germstar.[3]

11      61.    Equally uncompelling is Plaintiff's contention that he is incapable of meeting

12  the physical requirements of the position at Germstar. Germstar disclosed that "[t]here is

13  walking and *some* sitting and standing," but "[t]here is no lifting." AR 86 (emphasis

14  added). In response to the question, "Would an individual able to perform sedentary work

15  who needs to be able to change positions as needed be able to perform the physical

16  demands?," Germstar stated that it "would try to accommodate this." <u>Id.</u> Plaintiff claims

17  that it does "not seem likely" that Germstar would be willing to accommodate his physical

18  limitations "considering walking and standing were the primary physical requirements of

19  the occupation." Pl.'s Resp. at 16.[4] Setting aside the speculative nature of Plaintiff's

20  argument, the Court notes that the limitation identified by Dr. Gottlieb is that Plaintiff could

21  not walk or stand for more than an hour at a time. AR 1136.

22      62.    Finally, Plaintiff asserts that Fort Dearborn has failed to demonstrate his

23  ability to meet the physical requirements of the QAM position with Germstar. <u>See</u> Pl.'s

24

---

25  [3] It is axiomatic that, having been out of work for sixteen years, Plaintiff would not
    be current in terms of his knowledge of FDA regulations or GMPs. Germstar, as well as
26  various other employers, however, responded to the survey specifically taking into account
    Plaintiff's sixteen-year absence from the workplace.
27
    [4] In actuality, Germstar's response was that the position involved "some" standing.
28  AR 86.

Resp. at 16.  Plaintiff complains that Germstar's response that it would "try to accommodate" his need for a sedentary position is unreliable ostensibly because sedentary is not specifically defined.  Id.  However, the question presented in the LMS, in fact, recites the requirement that the applicant "needs to be able to change positions as needed to be able to perform the physical demands."

**Neutrogena**

63.     Next, Plaintiff contends that he is not qualified for the Associate Director of Quality Assurance position at Neutrogena Corporation because he "almost certainly lacked the minimum requirement of 5 years of experience in the quality assurance and/or compliance environment."  Pl.'s Resp. at 18.  Though Plaintiff admits that his work history, if "added together," satisfies Neutrogena's experience requirements, he contends that there is no guarantee that Neutrogena would consider his work experience in aggregate.  Id.  This contention lacks merit.  Nothing in Neutrogena's response suggests that it requires the candidate's five years of experience to have been acquired in a single position.

64.     Plaintiff also argues that he could not meet the physical requirements of the position with Neutrogena, which involve sitting, standing and walking and potentially some domestic and international travel.  AR 105; Pl.'s Resp. at 18.  However, Plaintiff ignores that Neutrogena stated that it would accommodate Plaintiff's need to change positions in order to meet the physical demands of the position.  AR 105.  As for the possible travel requirements, there is evidence in the record that Plaintiff is capable of travelling internationally, as demonstrated by his trips to Brazil and Venezuela.  Thus, the Court is not persuaded by Plaintiff's unsupported assertion that he would be unable to meet the physical requirements of the position at Neutrogena.

**Stivers**

65.     Stivers responded that it had a current opening for a Quality Assurance/Quality Control Manager and that it would consider hiring someone with Plaintiff's background and physical limitations.  AR 106.  Plaintiff avers that he is not qualified for the position, based on Stiver's statement that it preferred a candidate with

1  "more current" work experience.  AR 106.  As explained above, however, the question is

2  not whether the employer would actually hire Plaintiff, but rather, whether Plaintiff was

3  qualified or could reasonably become qualified for any other occupation.  See McKenzie,

4  41 F.3d at 1317.  Thus, the fact that Stivers stated that it preferred a candidate with "more

5  current" experience does not demonstrate that Plaintiff was not qualified for the Quality

6  Assurance/Quality Control Manager position.

7  **United Healthcare**

8           66.     United Healthcare responded that it would consider a candidate such as

9  Plaintiff for an Associate Director of Research Position, and that the position could be

10 performed from home.  AR 107.  Plaintiff maintains that he is not qualified for this position

11 because he lacks five or more years of experience in Medicaid/Medicare policy and related

12 issues.  Pl.'s Resp. at 19.  However, United Healthcare simply stated that such experience

13 was preferred, not that it was a mandatory requirement.  In addition, United Healthcare

14 stated that a person with Plaintiff's specific work experience "may qualify" for the position

15 but that he would need training in Medicare, Medicare and health insurance.  AR 107.

16 Notably, Plaintiff has made no showing that he would be unable to undergo such training.

17 **UCLA**

18          67.     UCLA responded that it would consider a person with Plaintiff's

19 qualifications for an Environmental Health and Safety Specialist III, Supervisor.  AR 108.

20 Plaintiff alleges that he is not qualified for the position, as he lacks, inter alia, the "ability to

21 analyze complex technical data from environmental health surveys," "[a] working

22 knowledge of federal, state and local health and safety codes," and "skills and

23 understanding in using ventilation measurements and air sampling equipment[.]"  Id.

24 Although Plaintiff's professional experience do not necessarily match up with the

25 requirements of the position, UCLA did indicate that it would consider a person with his

26 background.  Id.  Considering UCLA's survey responses as a whole, the Court is not

27 persuaded by Plaintiff's assertion that he is not qualified for the position.

28

68.     In sum, the Court finds that the vocational evidence in the administrative record further supports the conclusion that Plaintiff is not entitled to benefits under the Plan.

**I.      <u>CONCLUSION</u>**

For the reasons set forth above,

IT IS HEREBY ORDERED THAT:

1.     Plaintiff's motion for judgment is DENIED and Fort Dearborn's motion for judgment is GRANTED.

2.     Because this Order may contain information filed under seal by the parties, this document shall remain under seal pending further Order of the Court.  By no later than April 20, 2012, the parties shall jointly advise the Court which facts, if any, they contend should be redacted from the public version of this ruling.  To the extent any party seeks redaction of any portion of the Court's ruling, such party shall provide the Court with the legal authority for such request and a proposed redacted order for public disclosure.

3.     The Clerk shall close the file and terminate any pending matters.

IT IS SO ORDERED.

Dated: March 30, 2012

_SAUNDRA B Armstrong_
SAUNDRA BROWN ARMSTRONG
United States District Judge

1  UNITED STATES DISTRICT COURT
   FOR THE
2  NORTHERN DISTRICT OF CALIFORNIA

3

4  INCIONG et al,

5          Plaintiff,

6    v.

7  FORT DEARBORN LIFE INSURANCE
   COMPANY et al,
8

9          Defendant.
10  _____/

11                              Case Number: CV10-03384 SBA

12                              **CERTIFICATE OF SERVICE**

13

14  I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
    Court, Northern District of California.
15

16  That on April 9, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said
    copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing
17  said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
    located in the Clerk's office.
18

19

20
    Anna M. Martin
21  Rimac & Martin, P.C.
    1051 Divisadero Street
22  San Francisco, CA 94115

23
    Brent Dorian Brehm M
24  Kantor & Kantor
    19839 Nordhoff Street, #1B
25  Northridge, CA 91324

26  Caroline Lee Elkin
    Paul Hastings LLP
27  515 South Flower Street
    25th Floor
28

Los Angeles, CA 90071

David Faulkner Schmidt
Chittenden Murday & Novotny LLC
303 W. Madison Street
Suite 1400
Chicago, IL 60606

David Franklin Hauge
Michelman & Robinson LLP
455 Market Street
Suite 1420
San Francisco, CA 94105

Joseph John Hasman
Attorney at Law
303 W. Madison Street
Suite 1400
Chicago, IL 60606

Dated: April 9, 2012

Richard W. Wieking, Clerk

By: Lisa Clark, Deputy Clerk